1

1

2                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
3
   - - - - - - - - - - - - - - - - - - - - - - - -X
4                                       :
   UNITED STATES OF AMERICA,            :    95-CR-438
5                                       :
           v.                           :    U.S. Courthouse
6                                       :    Brooklyn, New York
   SALVATORE CANDELA,          IN CLERK'S OFFICE
7                              U.S. DISTRICT COURT E.D.N.Y.
              Defendant ★ MAR 27 2000  TRANSCRIPT OF SENTENCE
8                                       June 24, 1999
   - - - - - - - - - - - - - - - - - - - - - - - -X
9
   BEFORE:
10
   HONORABLE RAYMOND J. DEARIE, U.S.D.J.
11

12 APPEARANCES:

13 For the Government:              ZACHARY W. CARTER
                                    United States Attorney
14                                  One Pierrepont Plaza
                                    Brooklyn, New York 11201
15                                  BY:  ELIZABETH LESSER
                                         JOANNE NAVICKAS
16                                  Assistant U.S. Attorneys

17
   For the Defendant:              GAIL LASER, ESQ.
18

19 Sicilian Interpreter:           Anna Marie Marra

20

21

22
   Court Reporter:                 Marsha Diamond, CSR
23                                  Official Court Reporter
                                    United States District Court
24                                  225 Cadman Plaza East
                                    Brooklyn, New York  11201
25                                  (718) 254-7221

        MARSHA DIAMOND   CSR        OFFICIAL COURT REPORTER

(#219)

1

2           Proceedings recorded by mechanical stenography.

3       Transcript produced by Computer-Assisted Transcription.

4       THE CLERK: United States versus Salvatore Candela.

5       MS. LESSER: Elizabeth Lesser for the government.

6       MS. NAVICKAS: And Joanne Navickas.

7       MS. LASER: On behalf of the defendant, Gail Laser for

8  the defendant Salvatore Candela.

9       A N N   M A R I E   M A R R A, Official Sicilian

10  Interpreter, having been duly sworn, interpreted the testimony

11  as follows:

12       THE COURT:  Good morning, everyone.

13       MS. LESSER: Good morning Your Honor.

14       THE COURT:  Ms. Laser.

15       MS. LASER: Good morning, Your Honor.

16       THE COURT:  Mr. Candela, have you had an adequate

17  opportunity to review carefully with counsel, as necessary

18  with the benefit of an interpreter, the presentence report and

19  the related documents in the case?

20       THE DEFENDANT:  Yes.

21       THE COURT:  And do you feel prepared to proceed to

22  sentence this morning?

23       THE DEFENDANT:  Yes.

24       THE COURT:  You will be given an opportunity, as is

25  your right, to address the Court prior to the imposition of

1  sentence.  You should bring up anything you think I should be

2  aware of before I finalize my sentencing judgment.  All right,

3  sir?

4          THE DEFENDANT:  Yes.

5          THE COURT:  I am sorry?

6          THE DEFENDANT:  Yes, yes.

7          THE COURT:  Let me recite, generally speaking for the

8  record, what I have as far as the sentencing is concerned.  In

9  the course of the presentence report I count three addendum or

10  addendee to the report, the most recent of which is dated

11  April 2, 1999.  I have various submissions from the counsel,

12  responses, attached to Ms. Laser's letter of May 4th or a

13  series of letters from people, friends, the defendant himself,

14  defendant's wife, other friends and family and acquaintances

15  new and old, and the government's memorandum and

16  correspondence in opposition to a variety of different

17  things.  As a general matter, that sums up what it is that I

18  have.

19          MS. LASER: Can I interrupt, Your Honor?

20          THE COURT:  Yes, ma'am.

21          MS. LASER: The defendant sent -- my office sent a

22  sentencing memorandum.

23          THE COURT:  Yes, I have a sentencing memorandum.

24          MS. LASER: A 20-page sentencing memorandum.

25          THE COURT:  March 29th.  By cover letter of March

4

1   29th.

2         MS. LASER: Yes, it could be 20-page memorandum of

3   law.

4         THE COURT:  Looks like the same document.

5         MS. LASER: I didn't notice.

6         THE COURT:  Let me check the number of pages.

7         MS. LASER: Yes.

8         THE COURT:  Yes, I have that.

9         MS. LASER: Very good.

10        THE COURT:  The government's memorandum

11   correspondence in opposition, correspondence supplementing,

12   including your letter of March 26th, 1999 to the Court

13   relating to paragraph 165 of the presentence report.

14        MS. LESSER: Do you also have the government's

15   response, which we filed yesterday morning to Mr. Candela's

16   previous, which was filed the preceding date?  Our letter is

17   the 23rd, we received his sentencing memorandum the 22nd, this

18   is a supplemental sentencing memorandum in support of a motion

19   for a new trial.

20        MS. LASER: It is not with regard to sentencing

21   specifically.  That is why I didn't raise it at this point you

22   think you are going on to the post trial motions?

23        THE COURT:  I have your letter of the 23rd.  I have

24   your letter of June 23rd.  I have Mr. Candela's pro se

25   supplemental memorandum augmenting his motion for a new trial

5

1 | based on ineffective assistance of counsel.

2 | MS. LESSER: That is it, Your Honor.

3 | MS. NAVICKAS: Thank you.

4 | THE COURT:  That brings me to the next subject.

5 | There are a number of motions before the Court, motions for a

6 | new trial under Rule 33, motions directed under Rule 29(c),

7 | most of which I might say as a preliminary matter are probably

8 | not timely but worth discussing, particularly in a case when

9 | the evidence disproving claims could hardly be stronger, and

10 | perhaps even relevant to the defendant's application for a

11 | downward departure on the grounds of post conviction

12 | rehabilitation.

13 | I will give you a chance to supplement your papers

14 | briefly in just a moment but I just want to make sure,

15 | Mr. Candela, because you were convicted by jury verdict after

16 | trial, you will have an absolute right to appeal your

17 | conviction and sentenced to a higher court, assuming of course

18 | your continuing eligibility of appointment of counsel under

19 | the Criminal Justice Act.  Those fees and expenses would be

20 | paid by the court under the authority and provisions under the

21 | Criminal Justice Act.

22 | We have a motion to dismiss filed originally by

23 | predecessor counsel on the grounds of outrageous government

24 | conduct.  Mr. Levine, who was an interim attorney I believe,

25 | adopted that motion.  I don't know, Ms. Laser, whether you

MARSHA DIAMOND   CSR        OFFICIAL COURT REPORTER

1   have or have not.  It really doesn't matter.

2         MS. LASER: I do, Your Honor.

3         THE COURT:  Let me ask you to refresh my

4   recollection, who was the first attorney of record in the

5   case?

6         MS. LESSER: Mr. Batchelder was actually trial

7   counsel. It wasn't John Annuzio.

8         THE COURT:  I know Mr. Batchelder was not the

9   original attorney of record.  All right.  It doesn't matter.

10  Mr. Batchelder came in and then Mr. Levine for a brief period

11  of time, and then I think Ms. Laser you followed thereafter.

12        MS. LASER: I did.

13        THE COURT:  Does anybody wish to be heard on any of

14  the motions beyond what is already before me?  There being no

15  response I will just -- briefly, the motion based upon a claim

16  of outrageous government conduct is denied and denied without

17  hearing.  I see absolutely no basis for the motion. The motion

18  seems to forget that Mr. Detre was involved in a highly

19  sensitive, highly dangerous undercover operation for some 25

20  months, if I am not mistaken, during which he was called upon

21  and very effectively did play the role that he had previously

22  had before his decision to cooperate with the authorities,

23  seizing upon snippets of the conversations and there are many,

24  -- 800 some-odd conversations -- that there is an attempt

25  here to portray government through hand and mouth of Mr. Detre

MARSHA DIAMOND  CSR        OFFICIAL COURT REPORTER

1  as fermenting violence, condoning of violence, turning sort of

2  and ignoring violent criminal activity.  There is just nothing

3  here to support that.  Indeed, the record -- I think both the

4  trial record and based upon submissions thereafter, clearly in

5  my view satisfies me but there is nothing whatsoever here that

6  would give the Court cause for concern concerning the

7  propriety of the investigation.

8         Yes, Mr. Detre had to in the hard ball world of

9  distrust and suspicion, which was the milieu in which these

10  people operated, obviously had to sound credible, and to

11  remain viable, as I think was stated in the papers, and

12  maintain his own credibility and in this -- I don't think it

13  is an overstatement to say -- den of thieves was play acting.

14  He did it very effectively, and he was adopting the role the

15  defendant's believed was his and indeed, was his at one time.

16  He was one of them.  So he had to deploy the same tough talk,

17  the same macho -- speak the lingo of the crowd street of

18  violence, and nothing along those lines should surprise

19  anybody.

20         Beyond that, and more importantly, there were efforts

21  here, it seemed to me, through Mr. Detre to deal with some

22  very delicate situations that did evolve during the course of

23  these covert cooperation.  Criminal activities were being

24  planned, some of which of necessity contemplated the possible

25  use and use of violence.  They are to a large extent outlined

1   in the material and I am not going to recite them but they
2   were supported in the trial record.  One of the great
3   difficulties I have here, presumably unintelligible, intended
4   and in the way you and I share this, although not quite as
5   directly, so much time has passed since this trial, which was
6   a memorable trial, not one of your everyday trials, that it
7   really required me to get back into the thicket of the
8   testimony and to recall some of what was going on during
9   Mr. Detre's -- during the 25 months of Mr. Detre's taping.  I
10  have thought it was handled frankly rather deftly, some very
11  difficult situations -- very.  One might argue on the basis of
12  an isolated reference here or there, that Mr. Detre was in
13  effect encouraging violent activity, but it was clearly being
14  done to maintain his own credibility and standing within this
15  group, and when push came to shove and specific crimes were
16  being contemplated, the government took what I consider to be
17  responsible steps in attempts for Mr. Detre to undermine
18  criminal -- violent criminal activity.  For example, Detre
19  himself agreed on occasion to be the trigger man, if I recall
20  correctly.  From time to time, undercover agents were used as
21  an effort to provide certain considerations to the group, as a
22  way of hopefully dissuading them from continuing ongoing
23  criminal activity, and a number of things were being done.
24  And indeed, Detre himself was overheard on one tape, if I am
25  not mistaken, essentially trying to talk somebody out of and I

1   can't recall who it was, out of a particular contemplated

2   criminal act. So I don't think you can deploy undercover

3   operatives in an investigation of this sort, given the nature

4   of the targets and their activities, without making him

5   credible and without dealing with the prospects that these

6   undercover operatives made themselves from time to time what I

7   will call compromising positions.  I thought Mr. Detre was and

8   I thought the government acted far from outrageous.  I thought

9   the government, and the evidence shows the government acted

10  responsibly so I see nothing to the motion.  Most of these

11  take place -- you could almost -- they are all the same in a

12  way.  Literally, a bunch of money hungry sort of scheming low

13  lives and ultimately so focussed in life on what is the next

14  fix or what is the next score, and they drew no line at

15  violence.  It was part of their everyday vernacular.  Much of

16  it -- probably the reality of it was at that time that this

17  case involved plenty of violence. So with those comments,

18  realizing in large measure in a more detailed analysis that

19  appears in papers, I cannot credit the claim and deny the

20  motion.

21        The other motion really deals with the sufficiency of

22  the evidence on the issues that were dealt with earlier at

23  trial regarding the defense of coercion, the defense of

24  entrapment, both of which the jury was instructed about and

25  having heard the defendant's testimony as well as all the

1    other proof decided not unwisely in my personal view to

2    reject.  These issues relate also to the claim that

3    Mr. Batchelder did not provide effective assistance within the

4    Strickland standard to Mr. Candella.  I must say, so that you

5    know what I am thinking, when I read Mr. Candella's lengthy

6    letter and the correspondence Monsignor, Sister and fellow

7    inmate about the changes that they have observed in him over

8    these past few years since his original -- since the trial, it

9    was hard to divorce one from the other.  Analytically, of

10   course, you can.  Analytically, the level of diligence that

11   Mr. Batchelder brought to the defense of Mr. Candella, while

12   it relates to only one of his claims, the level of diligence

13   in and of itself doesn't speak directly to the constitutional

14   standard.  One can be extraordinarily diligent and

15   extraordinarily skillful, as he was in this case, and still as

16   a human being make a mistake that arguably could have affected

17   the fact, the outcome within the Strickland sense.  That

18   didn't happen here either but it is hard to reconcile, if you

19   know what I mean, Ms. Laser, it is hard to reconcile.  I am

20   not asking you to agree with me but it is hard to reconcile

21   this manifesto of a changed man with this flagrant and in my

22   view utterly irresponsible attack on a man who worked so hard

23   in his defense.  Again, on the businesses of snippets here and

24   in large measure because I credit Mr. Batchelder's affidavit,

25   bald faced lies about what was and was not done in his

1  defense.

2           MS. LASER: Would you like me to respond?

3           THE COURT:  It was a very disturbing document.

4           I will share with you because we are going get to the

5  question of downward departure.  I don't think it is fair of

6  me to have that thought without putting it out on the record.

7  You can respond now or you can respond whenever you like but I

8  want you to know what I am thinking.

9           MS. LASER: Well, then let me respond, since I think

10 my client would prefer it.

11          THE COURT:  I am sure.

12          MS. LASER: I mean, Your Honor, I think what was meant

13 in the motion that Mr. Candella made was not meant to be a

14 personal vendetta or attack on his attorney but simply a

15 presentation of what he was feeling from his view.  I read the

16 transcript of a hearing that occurred five weeks before the

17 trial and even began where Mr. Candella had written a letter

18 to Your Honor and had not been visited by his attorney --

19 Mr. Batchelder was going through some very difficult personal

20 concerns I know during that period.

21          THE COURT:  Only for a very brief --

22          MS. LASER: Let me just finish.  I mean the

23 expectations of Mr. Candella and Mr. Batchelder I think were

24 just different and I want you to recognize that sometimes a

25 client sees a particular strategy as the best one and that is

MARSHA DIAMOND   CSR        OFFICIAL COURT REPORTER

1   at odds with what the lawyer feels and the lawyer is more

2   experienced and the lawyer ultimately makes the decision but

3   that doesn't mean --

4         THE COURT:  Not in this case.

5         MS. LASER: That doesn't mean that the client is wrong

6   or that he even feels badly towards his attorney.  I think

7   what he was trying to do in his motions is say to you,

8   Your Honor, I am certain of these accounts, I was not guilty,

9   regardless of what the evidence was and regardless of the

10  conversations or anything.  Where I was during certain

11  incidents do not constitute my being found guilty of them.

12  For whatever reason, he truly believes that.  That does not

13  change the fact that he has in a very real sense done a

14  remarkable job in prison as a preacher.  I mean Sister Mary, I

15  have spoken to her on the phone, she is incredibly moved by

16  what he was able to do with his fellow inmates.  They are just

17  different things he feels about how his defense should be

18  handled.  They continue to this day.  Mr. Candella is not one

19  of the easiest clients, as you know, and as I have learned.

20  He has strong views about what should be done and that does

21  not change my understanding and belief that says what Sister

22  Mary has said. Sister Mary works with hundreds of inmates.

23  She offered to come to court today. She happens to be out of

24  town this week.  She has never offered to do that.  She is

25  truly moved by what Mr. Candella has done in prison and I

1   think, regardless of what shortcomings Mr. Candella may have

2   seen in Mr. Batchelder's performance, perhaps not as a

3   professional but as he personally felt certain things should

4   have been done or perhaps when he saw the ship sinking how in

5   his desperation felt do this, do this, anything to try and

6   change that momentum.  Sister Mary's words are very, very

7   moving to me, very convincing and only bolstered by those of

8   Mr. Rarmiro and I ask you and I don't want to repeat myself at

9   the latter part of my hearing before you, that you divorce

10  those two things because they were completely different.  What

11  he does with those inmates has nothing to do with his own

12  feelings of how his defense should have been handled.

13          THE COURT:  I quite agree but I feel strongly that if

14  there is a thought playing on my mind that impacts upon an

15  important aspect of the sentence, it is incumbent upon me to

16  share it with counsel.  You can certainly understand on the

17  surface of it --

18          MS. LASER: I do.

19          THE COURT:  Why the two appear to be at odds.  I

20  fully agree.  It is easy for me as the presiding judge to say

21  as counsel the defendants who took an active role in their

22  defense, as Mr. Candella certainly did, is something that I

23  welcome, and frankly, it makes my job a little easier, I

24  think, because then we don't have misunderstandings down the

25  road.  Mr. Candella decided he wanted to testify in this case,

1   contrary to Mr. Batchelder's advice.  That was his right.  He

2   did so.  Whether that affected the jury's verdict or not we

3   can only speculate but included in this attack, and I say that

4   in the legal sense, on Mr. Batchelder are some claims about

5   certain evidence that a man of this man's intelligence knows

6   better.  It is not just maybe.  I don't know if that is true.

7   Exhibit G, for example, I am referring now to page ten of

8   Mr. Batchelder's affidavit.  This was the workingman tape.

9   Exhibit B, if it shows he is a workingman, if it shows he

10  spends his time working by setting up different robbery

11  schools, that is Mr. Candella writes to me.  I have heard him

12  testify.  He has addressed the Court in public.  This is hard

13  for me to understand and maybe I am just asking too much of

14  him -- not as a lawyer but how one could with a straight face

15  claim that Exhibit G is somehow consistent with the defense,

16  that he is, after all, a hard workingman, not a career

17  criminal.  That is just one of any number of examples.  No, I

18  don't fault him for being active in his defense.

19          More importantly, I don't fault him being critical of

20  his defense attorney.  It is inevitable if somebody is

21  thinking about it there is going to be different and

22  significant differences but it is the nature of the attack.  I

23  was never appointed an investigator.  Now, I don't trust my

24  recollection on any of this, but I recall discussions in court

25  concerning the investigator that I appointed at the request of

1  Mr. Batchelder.  Now, it might be that your client feels the

2  investigator is deficient.  He has argued that Mr. Batchelder

3  failed to have an investigator appointed.  That is not true.

4        All right.  That having been said, I am all ears on

5  this experience that he has had since this time because I read

6  these letters.

7        MS. LASER: I actually don't have a whole lot more to

8  add.  I think those letters were more eloquent than I could be

9  about what role he has taken on since he has been in prison.

10 Sister Mary has explained to me that he has literally brought

11 in inmates who are agitated and on the verge of violence

12 because of the stress and anxiety of their situations and have

13 been soothed, is the best word, where Mr. Candella has

14 recognized their anguish an has approached them and brought

15 them into his prayer groups. His prayer groups started at

16 five, six people and they grew in both facilities to over 30

17 men, are moved by him and have literally changed their outlook

18 because of what he's done.  This is, you know, this continues

19 of course to this day but I mean his ability to lead in this

20 respect and his choice to lead in this way as opposed to -- in

21 prison, of course, there are all ways to lead.  I understand

22 his choice to lead these men into their religion and

23 spirituality and reconciling themselves in their situation and

24 move forward their lives in the most positive way, given the

25 negative situation they find themselves in, I think, is

1    remarkable and that Sister Mary, she is the witness.

2         My arguments here are simply parroting her.  She is

3    astounded by what he has done and I think her letter conveys

4    that and what is so remarkable here then for me to get a

5    letter from, as I did, from Mr. Romano -- I think that is his

6    name Romero -- excuse me, I am sorry -- which supports

7    everything she said in great detail as to how Mr. Candella

8    personally changed his life in such a positive way, that

9    simply supports Sister Mary, and corroborates everything that

10   she had written.  That letter from Mr. Romero was a surprise

11   to me.  I didn't expect an inmate to take that -- he hasn't

12   been sentenced yet and he is taking a risk, he might think, in

13   writing a supportive letter for another inmate but I think his

14   letter, which is also very articulate in what Mr. Candella

15   did, Mr. Candella approached him and saw his difficulty and

16   approached him and brought him along, and ultimately, got him

17   to take the steps ending in confession and then weekly and

18   daily prayer sessions that changed him.  This is continuing.

19   I assume it will continue over the decades that Mr. Candella

20   will find himself in jail and I think that should be something

21   that the Court can consider and should consider.

22        The law on post offense rehabilitation from the 2d.

23   Circuit just in the last three years is very, very generous.

24   Also, you know, dealing with the addiction, which is

25   impressive, but the point is that the 2d. Circuit encourages

1   this kind of downward departure.  I think that should

2   encourage this Court to consider it for

3   Mr. Candella.  We are not asking for a sentence which will

4   sharply change.  Mr. Candella is in his late 30s.  He is

5   facing an extraordinarily long mandatory sentence.  We are

6   talking about a downward departure, which may let him see the

7   light of day at the very end of his life. We are asking

8   essentially here for a window and I think that what he has

9   done and what he will continue to do based on what Sister Mary

10  says about him indicates that at the end of his life it will

11  be safe to let him out.  Our society will have punished him

12  enough.  We will certainly send a message of deterrence to all

13  of his cohorts or those that his sentence will touch, so all

14  of those messages that this Court has to deal with sending

15  will have been sent, but to give this man who is now giving so

16  many fellow inmates hope through spirituality, I think, it

17  might be appropriate and I am urging the Court to give him the

18  hope of this window of freedom at the end of his life might be

19  the right thing to do.

20          THE COURT:  I hope it is true.  If it is he has found

21  a calling.  If it is one might argue, and I say this somewhat

22  facetiously, he is right where he belongs because he has a

23  whole field of possible converts and never ending supply,

24  unfortunately, of people confined to these places, extended,

25  in my view, prolong the -- unnecessarily prolonged periods of

1   time.   I am not speaking necessarily about Mr. Candella.

2          The other thought I had when I was reading all of

3   this material is why in Heaven's name did they take away the

4   parole system.   What doubts I might have about the bona fides

5   of this and I certainly don't have it about the good faith of

6   the people who have written to me but whether it is an attempt

7   to manipulate the system, which one would have to contemplate

8   over time would be resolved, because if this is genuine it is

9   really something good happening, then let it persist.

10          MS. LASER: Can I speak to the manipulation question

11   and should have spoken to it earlier?   I think an inmate or

12   defendant or client who is seeking to manipulate over a

13   several year period, I think it to not have frankly the

14   success rate that Mr. Candella has had in shepherding his

15   fellows into religion and to his prayer groups that he has

16   had.   I think the insincerity of it would be too obvious.   I

17   think the sincerity has to be real in order for it to be so

18   persuasive and I think those inmates, were they able to, would

19   be able to convince this Court if they came in here one by one

20   and talked to Your Honor about what Mr. Candella has done,

21   just as Mr. Romero has done in his letter.   I think they would

22   be able to say to you it is not possible that a man could

23   change them.   We are talking about the hardened criminal.   We

24   are talking about the violent people. These people I don't

25   think could be easily so manipulated by someone who sought

1  simply to fool this Court.

2          THE COURT:  Do you want to speak to this issue?

3          MS. LESSER: Indeed, we do.  Mr. Candella is a fraud

4  in every sense of the word.  He is using religion to hide

5  behind and the hope this court will grant some leniency.  He

6  is a master manipulator. We saw that on 500 some-odd tapes and

7  with respect to the religious conversion and the timing of

8  that conversion, Your Honor, he claimed at trial to have found

9  God and yet, that didn't stop him from taking the stand and

10 lying repeatedly about the numerous crimes, he lied about his

11 conviction in Italy.  When he finally admitted to it he said,

12 yes, well, that was in abstentia, the host of lies, numerous

13 lies when he testified in this courtroom, so that was in the

14 context of a man who had already supposedly found God.

15         Moreover, Your Honor, with respect to the numerous

16 submissions he has filed with this Court he continues to lie.

17 He continues to deny his role and his participation in dozens

18 and dozens of violent crimes and I think that is

19 extraordinarily relevant.  A man who has really done the

20 religious conversion that he claims he has would have some

21 remorse.  He would be at a point where he would be prepared to

22 accept responsibility for his crimes and he has not done that

23 and he didn't do it before this trial.  He didn't do it during

24 the trial.  He has not done it during his submission and he is

25 standing here before Your Honor today continuing to deny his

1   involvement of crimes that he has admitted repeatedly on tape

2   as having committed, which he committed with accomplices who

3   testified at this trial.

4        The man you have before you, he is no ordinary

5   criminal.  He is not a man who just goes in and commits home

6   invasion.  He commits home invasion and while he does it ties

7   up all the family members, he ties up the husband, bangs him

8   on the head with a gun, requiring medical assistance.  He

9   walks a child around the house while both parents and

10  grandparents are tied up and asking that child to lead him to

11  the safe where the money is.

12       Moreover, he sexually abused a pregnant woman who was

13  the wife of a Staten Island butcher and also, a drug dealer

14  that he robbed.  These crimes are unspeakable.  The cafe in

15  Long Island, he laughs on tape repeatedly about how he kicked

16  an elderly man in the groin numerous times because he wouldn't

17  give up his money.  He is depraved.  He is a menace to

18  society.  I think these tapes and I think the evidence at

19  trial demonstrated overwhelmingly he is a one-man crime wave.

20  He is somebody who sat in a cafe in Brooklyn with Angelo Detre

21  and others and said I feel like committing a crime today, why

22  don't we go rob a Mac Donald's and off they went.  They

23  weren't able to find a Mac Donald's.  The timing was not

24  right., there were too many people around, but this mind is

25  unstoppable.  He is not only extraordinarily violent, he is

1  extraordinarily selfish.  At every opportunity he puts his

2  interest before those of his family, his friends, his criminal

3  confederates, as illustrated.  Your Honor, for example the

4  robbery, the Crossland Savings Bank, that was a score in front

5  of Antonio ^^ Musee.  As we point out in our letter that we

6  filed yesterday, he ^^ Antonio Duprey committed that robbery

7  because he didn't want to split the proceeds with Antonio

8  Russo because, as it is characterized it today when confronted

9  with this he denied, denied, denied.  This is a man who made a

10  fair amount of money from his criminal conduct and yet, he

11  couldn't share it with his wife and children and they had to

12  go to welfare.

13           Your Honor, why do I point to these examples?

14  Because there are numerous, numerous examples of how this man

15  has put his interests before everybody else's and I suggest to

16  Your Honor, his claim of having undergone a religious

17  conversion is more of the same.  It is a convenient tool.  It

18  is marvelous -- just a marvelous plan on his part. He is a

19  very good manipulator.  This is a sham.  He is a fraud,

20  Your Honor, and I submit to you that his behavior -- every

21  submission he has filed with this Court, every time he has

22  denied his involved.

23           In that cafe robbery involving the older man or the

24  other crimes that he has admitted on tape that he continues to

25  deny, refuses to accept responsibility and he continues to lie

1   and that is totally inconsistent with the Christian concepts

2   that he claims to have embraced.

3           MS. LASER: If I may respond.  Your Honor, we

4   recognize and accept the conviction to very, very serious

5   crimes here.  There is not much I can say with regard to those

6   but he is facing a mandatory sentence, a mandatory minimum

7   sentence of 45 years plus he is at a level 39 with criminal

8   history category of one, according to the probation report.

9   We are talking about an extraordinarily long sentence by any

10  measure for this defendant.  What we are simply trying to

11  achieve is that he have, as I said, a window at the end of his

12  life.  I recognize that the government's primary interest is

13  punishment, as perhaps it should be, but that is not the focus

14  of this Court.  This Court has other interests in sentencing a

15  defendant and I think I think can separate what he has done

16  since his conviction and his offense and term that as

17  extraordinary, and because it is extraordinary recognize it in

18  his sentencing as the 2d. Circuit invites.

19          MS. NAVICKAS: Just briefly with respect to

20  Ms. Laser's position, whether or not this is a genuine

21  conversion because of his ability to give comfort to people in

22  prison, I certainly believe that the Court wouldn't have to

23  look very far to see many examples of people who are extremely

24  manipulative and extremely persuasive.  Nevertheless, their

25  intentions are not the God-like intentions as are suggested

1   here, and the Court should take into account that this

2   conversion is not real, to the extent that our comments

3   haven't addressed his conversion in prison.

4           MS. LASER: Let me say simply in terms of the

5   application, that manipulation, Mr. Candella had no idea that

6   this was a basis for a downward departure.  As I got to know

7   Mr. Candella better I became -- I ultimately recognized

8   because of my understanding of the sentencing guidelines that

9   this could be a basis for a downward departure, otherwise, I

10  don't think he had any reason to know that this could be a

11  basis.  I have not seen this particular religious -- not

12  religious conversion but this basis -- his ability to lead in

13  prison and help others in prison, not strictly his own

14  conversion but that this isn't something that he could have

15  said, oh, if I become a leader I will get a downward

16  departure.  I can't really imagine that.

17          THE COURT:  I have to be candid. I can imagine him

18  thinking downward departure before the trial started.  I mean

19  you need to know what I have been thinking based upon my

20  presiding at trial.

21          MS. LASER: Before a year and half ago I wouldn't have

22  thought of that.  I happened to read slip opinions.  I

23  understand your opinion generally of this case but

24  nonetheless, I think it is a stretch to believe that this

25  defendant was so psychic and/or understood the nuances of

1   guidelines litigation that he would see.  I don't think that

2   is really a possibility.

3            THE COURT:  He wouldn't be the first defendant with

4   at least some familiarity.

5            MS. LESSER: If he came to court wearing religious

6   symbols, I submit to Your Honor, that is consistent with he

7   wanted to manipulate the jury.

8            THE COURT:  That is an interesting point that you

9   raise.  I have read this material and I will listen very

10  carefully  to what you are saying.  We have a little standing

11  -- I wouldn't call it a joke, because for some people it is

12  very sincere, but we observe something in chambers on

13  sentencing day and that is how many people appear before me

14  with the MDC, MCC rosaries issued.  So many about whom there

15  isn't the slightest suggestion of religious conviction

16  suddenly find their way to come through those doors with what

17  appears to be the exact same rosary all the time and I was

18  curious as to whether or not Mr. Candella was going to present

19  today with such an emblem of religion and I guess to strike a

20  note in his favor he didn't.  But I did recall at the time of

21  trial there was prayer book and I think his wife had a prayer

22  book.

23            MS. LESSER: And necklace, the rosary beads.

24            THE COURT:  I think we have been through this.  The

25  fact of the matter is it is all possible.  Certainly, the

1   crimes are -- certainly just the evidence is very disturbing

2   and talk about convincing overwhelmingly of his involvement,

3   in a meaningful way in all of these crimes, it is not even

4   necessarily inconsistent with the fact that he has taken a

5   different road.  It is not necessarily inconsistent with that

6   possibility that he chooses not to come forward and suddenly

7   professes acceptance of responsibility for all these criminal

8   acts.  He has other interests in mind no doubt. Understand,

9   but not necessarily inconsistent.

10          Okay.  That having been said, I think there are two,

11  if I am not mistaken in this mountain of papers, guidelines

12  issues that are the exception that are before me.

13          MS. LESSER: The leadership issue.

14          THE COURT:  There is a leadership issue and the

15  question of threat. As I understand the latter, it is

16  subjective test, if the victim feared for his life, is that

17  not part of this?

18          MS. LESSER: Yes.  With respect to the one -- with

19  respect to one of the robberies, it is a subjective test.

20  Now, we have not had the testimony of that victim.

21          THE COURT:  According to the government, they

22  represent through Mr. Hanna, who I see is here in the

23  courtroom, that the victim was interviewed and took the

24  position he, indeed, believed when Mr. Candella appeared with

25  the newspaper.

1          MS. LESSER: That is right, a bag.

2          THE COURT:  Threatening.  Just picture that he had a

3    gun and he did, indeed, fear for his life.

4          Unless there is a specific challenge for that, that

5    would be sufficient to trigger that assessment the others had

6    to do with the leadership question, and if you want to be

7    heard I will hear you.

8          MS. LASER: Your Honor, I think that frankly that

9    there is -- not having read the transcript and familiarized

10   myself with the documents in this case and many of the tapes,

11   Your Honor's description early on that this was just a bunch

12   of individuals who had gotten together and decided to commit

13   crimes, I think is the best description of what occurred

14   here.  There's simply nothing that indicated even in the trial

15   testimony of both Detre and Mr. Centore that indicated that

16   Mr. Candella was their boss.  All of them contributed to this

17   criminal endeavor in their own way.  Even when Detre allocuted

18   he described himself, as he himself described them, as just a

19   bunch of guys out to make money.  Even in his allocution he

20   did not say Candella got us to do this and we were under Mr.

21   Candella's control.  When the government replied to our papers

22   what the government in their letter described was an active

23   participant but an active participant does not qualify for the

24   extra four points for a leadership role.

25         It was clear from the testimony that everyone in the

1  group suggested various scores that should occur, various

2  robberies or targets for robberies.  This was across the

3  board.  There is no evidence that Mr. Candella recruited

4  anyone for this group.

5          THE COURT: I have to stop you there because that is

6  just not right.  There is, depending upon which robbery.

7          MS. LASER: Yes, I mean of course, he might say, oh,

8  let's get Centore and somebody else to come with us but in

9  terms of the group, the group was a group that basically got

10 together through suggestions of other people.  Taglianetti

11 introduced a number of these people to Detre to Persichetti,

12 Minneni, and Centore.  It wasn't Mr. Candella who brought

13 these individuals into the group.  What it ended up being

14 really, as Ms. Lesser described as in the Mac Donald's

15 incident where they were sitting around, said let's do this

16 and one of them said let's do that, but that makes that person

17 a participant not a leader in the sense that the guidelines

18 contemplated when they allowed for a fully four extra points

19 for leadership.

20         Mr. Candella received no greater slice of the

21 proceeds than anybody else.  Perhaps on one incident over

22 another he got a little bit more or he got -- manipulated it

23 -- to use perhaps the government's word  -- to get more but

24 it wasn't because he had ultimate control over everybody where

25 he was a leader in the sense the guidelines contemplated that

1    would.

2          THE COURT:  There is evidence in the case that he in

3    some instances decided who got what.

4          MS. LASER: Perhaps in some instances, but in other

5    instances he did not make that decision.  Our point is in our

6    brief that this was going on for a long time. There were

7    various incidents. It was a very fluid set of circumstances

8    where different people would make different suggestions.

9    Different people would have control in a loose since of that,

10   particular incidents, but Mr. Candella was not the

11   over-arching leader of this criminal enterprise, and I think

12   that is what is being contemplated when you are adding this

13   amount of time to this individual's sentence.

14          In their letter I recall a snippet of a quote where

15   Detre said with regard to where they were having sort of an

16   argument about what to do about one incident and Detre says,

17   well, you are the boss.  You know tape 300 July 29th, 1993

18   Candella says to Detre you are the boss, you are the boss and

19   Detre replies, yeah, I am the boss.  I think that best

20   demonstrates how it went back and forth and how they would

21   deal with each other but they ultimately dealt with each other

22   as equals.  They did not deal with each other in a way in

23   which Centore and Detre listened to Candella and were beholden

24   to him.

25          Detre and Centore were doing as were Taglianetti and

1   Perscehtti, before Candella came on board, during the time

2   Candella came on board with them, they were doing crimes on

3   their own.  So that also doesn't demonstrate a leadership role

4   on the part of Mr. Candella and I think that active, even an

5   essential participant does not qualify as a leader.

6          THE COURT:  Well, on that point we can agree.  Yes,

7   this is somewhat of a fluid situation, no question about it.

8   It wasn't a lot structured -- one might say even highly

9   structured.  It was not your typical hierarchy but there was a

10  hierarchy.  I can't help but mention this because the record

11  should reflect it and I will grant you now what I observed the

12  defense attempt to do in arguing for ineffective assistance of

13  counsel relative to the defenses of entrapment and coercion

14  but that is what I call the Alexander Hague tape which is a

15  reference to page seven of the government's letter,

16  conversation of April 12, 1993.

17          I am in charge so I do whatever the fuck I want.  The

18  context of that was a gun deal. Mr. Candella was apparently

19  deciding whether or not -- if I recall correctly -- not

20  spelled out in the letter  -- whether Detre was going to be

21  able to keep guns unless on a consignment basis or what but it

22  was more importantly than what was said because I grant you it

23  is a snippet, if you listen to that conversation.  This was

24  played at trial, wasn't it?

25          MS. LESSER: I believe it was.  Actually, it was.  It

1   was played at this trial.

2          THE COURT:  That is when it came up with the

3   Alexander Hague reference.

4          MS. LESSER: Yes, it was.

5          THE COURT:  It was a pretty imposing few moments on

6   that tape but I think the point really is that everyone was --

7   you are quite right -- everyone was suggesting possible

8   scores, maybe more so Mr. Candella than others, but every one

9   was. Everyone was looking for a quick easy way to make money

10  but when they sent him on a score, whether it was the pizza

11  man out in Staten Island, the push-in robbery I think on Long

12  Island, the Globe, the cigarette robberies, when he settled on

13  a score and came time to decide who is going to be involved,

14  what the plan of attack was, what role each individual had,

15  whether Mr. Candella himself would be involved in the actual

16  assault, that usually was dependent upon whether he knew the

17  victim, and once the crime was committed where everybody would

18  retreat to, and then take their cut is generally determined by

19  Mr. Candella.  Boy, that sounds like leadership to me.  Sounds

20  like the man in charge to me.

21          Do you want to add anything to this?

22          MS. LESSER: Again, we would rely on our May 3rd, 1999

23  letter where we have tried to set a number of examples to

24  illustrate his leadership role in this organization.

25          But I would just say, Your Honor, specifically with

1   respect to the Globe robberies, the practice was actually even

2   prior to that, the introduction by Lorenzo Menino, Candella to

3   Detre and Taglianetti was for the express purpose of Detre and

4   Taglianetti joining this robbery crew.  It was his crew, and

5   that was the purpose for which they were introduced.  Because

6   Detre and Taglianetti had become unhappy with Persichetti and

7   the scores had not netted money.  They really became

8   dissatisfied with him so that was when Menini introduced him

9   to Candella to this -- a lot going on, lot of scores and was

10  plugged into these Globe truck hijackings.

11          And again, very briefly, with respect to the manner

12  in which they were organized and took place, the pattern was

13  always the same, which was Candella would alert the others

14  when he knew of a score.  They would often assemble at his

15  house where the other members that were going to go out in a

16  particular robbery would arm themselves with weapons that

17  Candella kept at his house -- mask, gloves, etcetera and then

18  after the robbery was committed, the proceeds from that

19  robbery would be delivered to his basement.  He would

20  distribute the monies from the stolen cigarettes to those who

21  had participated.  So it really does fit within the

22  definition.  We submit, Your Honor, that the guidelines would

23  require for the enhancement based on leadership and again, I

24  am not going to reiterate what is in here -- it is all in here

25  but I would make one brief additional point and that is,

MARSHA DIAMOND   CSR        OFFICIAL COURT REPORTER

1  Ms. Laser says that Detre refers to him as a boss but it

2  wasn't just Detre, the accomplice cooperating witness, it was

3  all the others, such as Angie Piscatello and again we quote

4  from the tape next to last paragraph, page seven where it is

5  said to Candella:  You are the boss, you do what you want to

6  do.  So that was the perception of others as well.  It was

7  consistent with his conduct and role and it was the perception

8  of his role as other criminal confederates.

9       MS. LASER: I say to my husband you are the boss but

10  that really --

11       THE COURT:  You don't mean it.

12       MS. LASER: Exactly.  I think that we have to

13  recognize that here with regard to these hundreds and hundreds

14  of tapes of these individuals talking, I think we have to look

15  at the nature of these numerous crimes and how they float --

16  these various individuals float in and out.  If Candella was

17  the leader there wouldn't be crimes in which he was not

18  participating or that he was not leading and that doesn't

19  happen when you are involved in a four-point leadership role.

20       I keep bringing you back to that but we are talking

21  about a large aggravation with a sentence.  Perhaps not

22  proportionality but nonetheless, a significant amount of years

23  at this guideline level but if I am losing here, then I want

24  to bring you back to the fact that, if anything, he should not

25  get more than supervisory role of additional two points.

1          When you are talking about people who will commit

2   crimes on their own without their supposed supervisor or

3   leader you were talking about the people who are very

4   independent and you are talking about where others

5   consistently recommend sites and share in the proceeds fairly

6   equally.  The fact they all congregate at his house is really

7   irrelevant.  I think we have to look at the strength of these

8   other participants and how much input they had in bringing

9   others in, as Taglianetti did, and adding to what was going

10  on.  Candella was not a one-man show and he did not use his

11  people as his subordinates.  They were his cohorts.

12          THE COURT:  All right.  Well, you know, as strong as

13  this case was and as odious as the crimes were, given the

14  strategies we are in now, I am not in a hurry to increase the

15  man's adjusted offense level.  I do, on the other hand, have

16  to take the evidence as I understand it.  Anything else that

17  you want to discuss before I give Mr. Candella an opportunity

18  to be heard?

19          MS. LASER:  No, Your Honor.

20          I just want to make one quick response to something

21  Ms. Laser said and that was in the context of a legal

22  argument.  She said the government wants to see him punished

23  and I will just add to that Your Honor, yes, we would like to

24  see him punished for his crimes. We would like to see him be

25  made to accept responsibility by serving a lengthy sentence.

1   We also want to see the public protected.  There is nothing

2   suggesting that he wouldn't go back on his crime spree when he

3   gets out, except possibly very, very old age. That is what we

4   are talking about here.  The window, as I am seeking as the

5   only window I can see, is, one, he will be so incapacitated by

6   old age that he will be powerless with regard to the

7   government's fears.  So I don't think it is even a question

8   here.

9           THE COURT:  Mr. Candella, is there anything you would

10  like to say, sir?

11          THE DEFENDANT:   No, thank you.

12          THE COURT:  Anybody else?

13          MS. LESSER: No, Your Honor.

14          THE COURT:  Well, I think in your extended discussion

15  we probably said all we need to say about the gravity of the

16  crimes and the significance of Mr. Candella's participation

17  and role in them, which I believe is accurately characterized

18  in the presentence report based on my recollection of the

19  evidence and my review of the evidence more recently.

20          It was an overwhelming case.  I do hope that there is

21  something to the observation of these good people who have

22  written to the Court on his behalf.  I earnestly hope that.  I

23  don't bring special powers to this exercise.  I can't say for

24  sure. Ms. Laser's made some telling points about the

25  unlikelihood that someone could prolong this level of

MARSHA DIAMOND   CSR        OFFICIAL COURT REPORTER

1  intensity and apparently reach so many otherwise criminally

2  inclined people.  I hope that's true and I hope it's in

3  earnest because it will give Mr. Candella something to devote

4  himself to, a genuine calling during his years of confinement.

5        The jury having found him guilty on a number of

6  counts, excuse me -- for just a second.  I want to make sure

7  we don't louse this up.

8        I believe the range as presently recited is 262 to

9  327 months.

10       MS. LESSER: That is correct.

11       THE COURT:  Subject to the maximum penalties that

12  apply to certain counts well below that and then with respect

13  to Count Seven, I am obligated to impose a five-year term

14  consecutive to the sentence imposed on Count Six, correct?

15       MS. LESSER: Yes.

16       THE COURT:  And then beyond that with respect to

17  Counts 11 and 19 I am obligated to impose under 924(c) a

18  20-year term of imprisonment on each count to run concurrently

19  to each other but consecutive to the count of the sentence

20  imposed on Counts Ten and 15.

21       MS. LESSER: No, I believe they are run consecutively

22  to each other.  I believe that is correct, Your Honor and I

23  believe the third addendum.

24       THE COURT:  The third addendum?

25       MS. LESSER: It really doesn't address it.  I believe

1    each has to be consecutive to the other.

2            THE COURT:  I remember first confronting this

3    statute, and being frankly overwhelmed by it.  You are

4    suggesting that I have to impose -- is it 20 or 25?

5            MS. LESSER: The first one is five years consecutive

6    to the second, which would be 20 and any conviction thereafter

7    on the 24-C carries a 20-year penalty.  It is actually 45.

8            THE COURT:  I am confused. Point me to the specific

9    section. I think I have it in front of me.

10           MS. LESSER: I don't have it in front of me.

11           MS. LASER: You can see it in page two.

12           MS. LESSER: Your Honor, we are getting a code.  I

13   forgot my code.

14           THE COURT:  Here, do you need it?

15           MS. LASER: I would share it with her.

16           (Mr. Lesser and Ms. Laser perusing.)

17           THE COURT: We have to be careful.  We have not had

18   amendments that post date the activity.

19           MS. LESSER: That is exactly what we are thinking

20   about.

21           MS. LESSER: These two.

22           THE COURT:  Some of them, clearly.

23           MS. LESSER: I don't know if we should get an earlier

24   code.

25           THE COURT:  We can do that.

1          MS. LASER: Or it is just obvious from the amendments

2     as they are written here.

3          MS. LASER: Because under subsection C C 1 C it

4     indicates the 25 years.

5          MS. LESSER: I think that is adding the five, plus 250

6     for the second one.

7          THE COURT:  No, that is what I first thought, but if

8     you go on and read the concurrent provision, that clearly it

9     has been amended.

10         MS. LESSER: I think this changed after these were, so

11    we would have to go with the earlier.  I think the older code

12    is actually more clear, Your Honor and I know the way you

13    know, I know this from having had cases with the subsequent or

14    multiple 924(c) counts.  The first is five.  Every one after

15    that is 20 years and they run consecutive to each other,

16    however, concurrent to the other counts in the indictment.  In

17    other words, it is five plus 20, plus 20, and all these

18    subsequent counts are consecutive to each other.  However, the

19    924(c) counts all, whatever that total is that it adds up to,

20    runs concurrent with whatever.  That is right.

21         THE COURT:  That is not my recollection.  I think we

22    better take the time.  I have one other question as long as we

23    are doing this.  The total sentence, the lower end of the

24    guideline, bottom of the guideline is in any statutory maximum

25    being here for the most serious offense is 240 months.  Low

MARSHA DIAMOND  CSR          OFFICIAL COURT REPORTER

1 | end of the guidelines is 262 months.

2 | I could impose a sentence of 262 months because I
3 | could make the sentence, to the extent necessary, to achieve
4 | low end of the guidelines range before consecutive, but in a
5 | case where I have to add on top of this the gun count and then
6 | in a 20-year gun count and then they, Heaven, forbid, get
7 | another consecutive count I would certainly not be inclined to
8 | make any of the underlying counts consecutive.  I just want to
9 | make sure I am not missing anything there.  Statutory maximum
10 | five-year counts, we have ten-year counts and we have 20-year
11 | counts.  The statutory maximum most serious offense is 240
12 | months.  That is below the guidelines range.  Given the need
13 | to make consecutive these gun counts I would not consider
14 | making the initial sentences on the non-gun counts in any way
15 | consecutive.

16 | MS. LASER: Is that your implicit ruling on the
17 | leadership?

18 | THE COURT:  No, I thought I made that before.  I
19 | think the presentence report has correctly characterized.

20 | MS. LESSER: Could we have a brief recess?

21 | THE COURT:  I think we will have to. I have another
22 | matter on the calender.  We will take the remaining calendar.

23 | (Pause in the proceeding.)

24 | THE COURT:  All right.  Have you made progress and is
25 | there an agreement, at least as to what the statute requires?

1           MS. LASER: We realized that the statute currently,
2   when you look at the 1999 code, is different than what the law
3   is for this case.  It was my understanding and I think
4   Ms. Lesser called the supervisor at the probation department
5   that the three counts of 924(c) should go five, 20 and 20
6   consecutively.  That, in fact, was my understanding of the
7   what the law is.  However, because the library downstairs
8   didn't have a 1993 or 1994 code, I had my office read it to me
9   and I am wondering if the law not does not permit the second
10  and 924(c)s to run concurrently with each other, so that it
11  would be so that you could in your discretion have the 20s be
12  -- 20, 20 be concurrently with each other, so it isn't
13  consecutive 20 as opposed to a consecutive 45.  As I read the
14  statute I understand it is permissible.  However, Ms. Lesser
15  disagrees.
16          MS. LESSER: The statute has never changed,
17  apparently.
18          THE COURT:  You may very well have it inside.
19          MS. LASER: This one doesn't help us.
20          THE COURT:  This will tell us whether or not the
21  specific provision, which is the point Ms. Lesser is about to
22  make, has been amended.
23          MS. LESSER: The law has not changed with respect how
24  you treat subsequent 924(c) counts, even though the drafting
25  is different.

MARSHA DIAMOND  CSR       OFFICIAL COURT REPORTER

1    THE COURT:  You are referring to 924(c) subdivision D

2  ii in terms of imprisonment imposed on a person under this

3  subsection shall run current with any other term of

4  imprisonment imposed on the person, including any term of

5  imprisonment imposed for violation of drug trafficking, crime

6  during which a firearm was used, carried or possessed.

7    MS. LASER: I am wondering if that could be

8  interpreted to read that into term of imprisonment imposed

9  under this subsection and their subsection meaning all three

10  of the 924(c), so that all three of the 924(c)s could be

11  running concurrent.  That is actually that phrase under this

12  subsection.

13    THE COURT:  I understand your point.  I urge you to

14  sit upon the panel in the Court of Appeals and perhaps they

15  will prevail but that is not my reading of it.

16    MS. LESSER: Additionally, it does speak to the

17  statutory issue, precisely this issue, U.S. v.  Lindsay (ph)

18  and how you handle subsequent 924(c) counts that are connected

19  to the separate crimes of violence and separate uses of the

20  gun.  It kind of gets back to the --

21    THE COURT:  I did review this in connection with

22  another case that you have some familiarity with.  I did,

23  indeed, have occasion to read that case.

24    MS. LASER: I think what I am saying is in your

25  discretion you could do it.  In your discretion you need not

1   based on the language but in your discretion you could.

2          THE COURT:  I hope you can wage war and get a little

3   discussion, but the way I read this rather broad and inclusive

4   language I have no discretion.

5          MS. LESSER: I was going to address the issue of

6   guidelines.  Again, what we have learned from Tony Garroppola

7   and we looked at the guidelines, it does seem to support what

8   he said, 5G1.2d stands for the proposition that you aggregate

9   statutory amounts and again, Your Honor can see the language.

10  It is when you have a guidelines range like ours at 262, since

11  we have multiple robbery convictions.

12         THE COURT:  I thought that is what I said.  That is

13  clear.

14         MS. LESSER: Okay.  I am sorry.

15         We are talking statutory and guidelines.  I guess I

16  misheard what you said.

17         THE COURT:  Okay.  5G1.2D.

18         MS. LASER: Essentially, as I remember, it was a

19  discretion decision.

20         MS. NAVICKAS: It says here shall run.

21         THE COURT:  It does. Well, they have covered all the

22  basis.

23         Well, lest any of my reservations about the statutory

24  penalties and the application of the guidelines be

25  misconstrued, obviously, I made it clear, Mr. Candella should

MARSHA DIAMOND   CSR        OFFICIAL COURT REPORTER

1   be punished severely.  I have expressed my views that if his

2   conversion is legitimate, I truly hope that he will stand in

3   the position to help others.  Whether the crimes for which he

4   stands convicted require the extended period of incarceration

5   that I am obligated to impose is a subject about which people

6   reasonable people might differ.

7           The crimes were horrible, they were violent, but

8   there, nevertheless, remains a question as to whether or not

9   this punishment is absolutely required.

10          I do think finally putting aside this question of

11  post conviction rehabilitation about, incapacity is a

12  legitimate basis for sentence and perhaps the most compelling

13  in this case.

14          With respect to those counts subject to the statutory

15  maximum penalties, of course, I impose concurrent sentences on

16  Counts One, Four, Six, Eight, Nine, Ten, 12, 15, 23, it is 23

17  through 34, I want to make sure.

18          MS. LASER: Twenty-three, 24, it is in the first page

19  of the P.S.R.

20          THE COURT:  Thanks.

21          Twenty-three, 24, 24, 25 -- 24, 25, 26 and 27 through

22  33 -- 27 through 33 and 34 an aggregate sentence in the amount

23  of 262 months, five years supervised release, standard

24  concerns of supervised release shall apply.  With respect to

25  Count Seven, five-year term of imprisonment, consecutively

1  through with respect to Count 11, 20-year term of imprisonment

2  consecutive to the sentence imposed on Count Seven and

3  consecutive to the aggregate sentence imposed on previous

4  counts, and with respect to the Count 19, 20-year sentence to

5  run consecutively to the sentence imposed on Count 11, and

6  consecutive to the sentence imposed on Seven, and consecutive

7  to the sentences imposed aggregately on the prior counts.

8        There will be no fine in light of the personal

9  circumstances of the family and there are special assessments

10 to each of these counts in what amount -- in the amount of $50

11 each, totalling I believe $1,150.  I have already advised the

12 defendant of his right to appeal.

13       Ms. Laser, I assume you will file the notice of

14 appeal on behalf of Mr. Candella.

15       Is there anything else?

16       MS. LASER: Yes.

17       THE COURT:  Is there anything else?

18       MS. LESSER: No, Your Honor.

19       THE COURT:  Well.  Hard to say good day.

20       Good luck.  Make the best of a bad situation.

21       Thank you, for your help.

22       (Proceedings concluded as above set forth.)

23                 oOo

24

25

I HEREBY CERTIFY THAT THE FOREGOING
IS A TRUE AND ACCURATE TRANSCRIPT
FROM MY NOTES IN THIS PROCEEDING.

_Marsha Diamond_
OFFICIAL COURT REPORTER
U.S. DISTRICT COURT